# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued September 18, 2015        Decided October 30, 2015

No. 14-5309

AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS,
APPELLANT

v.

INTERNAL REVENUE SERVICE AND JOHN A. KOSKINEN, IN HIS
OFFICIAL CAPACITY AS COMMISSIONER OF INTERNAL REVENUE
SERVICE,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:14-cv-01190)

———

*Douglas R. Cox* argued the cause for appellant. With him on the briefs were *Russell B. Balikian* and *Jacob T. Spencer*.

*Bethany B. Hauser*, Attorney, U.S. Department of Justice, argued the cause for appellees. With her on the brief were *Gilbert S. Rothenberg* and *Jonathan S. Cohen*, Attorneys. *Ellen P. DelSole*, Attorney, entered an appearance.

*Noel L. Allen* was on the brief for *amicus curiae* National Association of State Boards of Accountancy in support of neither party.

Before: TATEL, *Circuit Judge*, and EDWARDS and GINSBURG, *Senior Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* TATEL.

TATEL, *Circuit Judge*: Appellant, a professional association of certified public accountants and their firms, challenges an Internal Revenue Service program that allows previously uncredentialed tax return preparers who take required courses and fulfill other prerequisites to obtain a "Record of Completion" and to have their names listed in the IRS's online "Directory of Federal Tax Return Preparers." Appellant argues that the IRS lacks statutory authority to implement the program, acted arbitrarily and capriciously in adopting it, and failed to engage in required notice and comment rulemaking. The district court found that appellant's members will suffer no actual or imminent harm and dismissed the complaint for lack of Article III standing. For the reasons set forth in this opinion, we conclude that Appellant has adequately alleged the program will subject its members to an actual or imminent increase in competition and that it therefore has standing to pursue its challenge.

## I.

Because "[t]he federal income tax code is massive and complicated . . . it is not surprising that many taxpayers hire someone else to help prepare their tax returns." *Loving v. IRS (Loving III)*, 742 F.3d 1013, 1014 (D.C. Cir. 2014). The tax return preparer market consists of four groups: (1) certified public accountants (CPAs); (2) lawyers; (3) "enrolled agents"; and (4) unenrolled preparers. CPAs and attorneys are subject to state professional licensing regimes, and enrolled agents are licensed by the IRS and subject to various IRS requirements including taking continuing education courses and passing an exam. These three groups are also subject to

IRS Circular 230, which includes rules and disciplinary procedures for practice before the IRS.

By contrast, unenrolled preparers are subject to less stringent regulation. Although they, like all tax return preparers, must obtain a "Preparer Tax Identification Number" and list that number on every return they sign, *see* Treas. Reg. § 1.6109-2, they have no obligation to take courses or pass an exam. The "hundreds of thousands" of unenrolled preparers, *Loving III*, 742 F.3d at 1021, account for about sixty percent of all tax return preparers. Appellees' Br. 4.

In 2011, the IRS issued the Registered Tax Return Preparer Rule ("the Rule"). 76 Fed. Reg. 32,286. The Rule would have required unenrolled preparers to become "registered tax return preparer[s]" in order to continue assisting clients with their tax returns. *Id.* at 32,301. Under the Rule, preparers would have had to complete fifteen hours of continuing education training annually, pass a written examination, and subject themselves to portions of Circular 230. *Id.* at 32,301, 32,303, 32,306.

Three unenrolled preparers challenged the Rule, arguing that it exceeded the IRS's authority to "regulate the practice of representatives of persons before the Department of the Treasury." 31 U.S.C. § 330(a). In *Loving v. IRS*, the district court agreed and permanently enjoined the IRS from enforcing the Rule against unenrolled preparers. 917 F. Supp. 2d 67 (D.D.C. 2013). Although the district court later denied a stay pending appeal, it modified its order to make clear that nothing in the injunction "requir[ed] the IRS to dismantle its entire scheme" because the IRS could "choose to retain the testing centers and some staff, as it is possible that some preparers may wish to take the exam or continuing education

even if not required to." *Loving v. IRS*, 920 F. Supp. 2d 108, 111 (D.D.C. 2013). "Such voluntarily obtained credentials," the district court explained, "might distinguish [participating preparers] from other preparers." *Id.* Although we affirmed, we said nothing about either the district court's clarification of its injunction or the permissibility of the Rule remaining in place on a voluntary basis. *Loving III*, 742 F.3d 1013.

After our decision in *Loving*—and perhaps inspired by the district court's suggestion—the IRS adopted the program at issue in this case, the "Annual Filing Season Program" ("the Program"). The Program offers preparers who, among other things, complete required continuing education, pass an exam, and subject themselves to portions of Circular 230, a "Record of Completion"—an official notice that they have complied with the Program. *See* Annual Filing Season Program, Rev. Proc. 2014-42, 2014-29 I.R.B. 192. In addition, the IRS lists participating preparers in its online "Directory of Federal Tax Return Preparers," which also includes CPAs, lawyers, and enrolled agents. Internal Revenue Service, *Directory of Federal Tax Return Preparers with Credentials and Select Qualifications*, http://irs.treasury .gov/rpo/rpo.jsf (last visited Oct. 20, 2015). The IRS designed the Program to "encourage tax return preparers who are not attorneys, certified public accountants . . . , or enrolled agents . . . to complete continuing education courses for the purpose of increasing their knowledge of the law relevant to federal tax returns." Annual Filing Season Program § 1. The Program is "voluntary and no tax return preparer is required to participate." *Id.* § 3.

According to IRS Commissioner John Koskinen, the Program allows participants "to stand out from the competition by giving them a recognizable record of completion that they can show to their clients." Compl. ¶ 7

(internal quotation marks omitted). The Program, however, prohibits preparers from using "the term[s] 'certified,' 'enrolled,' or 'licensed' to describe [a Record of Completion] or in any way imply[ing] an employer/employee relationship with the IRS or mak[ing] representations that the IRS has endorsed the tax return preparer." Annual Filing Season Program § 4.07.

The American Institute of Certified Public Accountants ("the Institute"), a professional organization with about 400,000 accountants and accounting firms as members—some of whom employ unenrolled preparers—challenged the Program, arguing that even the voluntary program exceeds the IRS's statutory authority and that, in adopting it, the agency acted arbitrarily and capriciously and failed to comply with required notice and comment procedures. Anticipating a standing challenge, the Institute alleged in its complaint that the Program harms its members in three ways: (1) by confusing consumers and causing competitive harm; (2) by imposing regulatory burdens on unenrolled preparers that some of the Institute's members employ; and (3) by increasing the regulatory burden on Institute members. Compl. ¶ 12.

The IRS did in fact seek dismissal on standing grounds, arguing that the Program caused no harm because it was entirely voluntary, and that, regardless, each of the Institute's three standing theories was fatally flawed. In opposing the IRS's motion to dismiss, the Institute submitted seven declarations to substantiate its allegations regarding its Article III standing.

The district court granted the IRS's motion to dismiss. *American Institute of Certified Public Accountants v. IRS*, No. 1:14-cv-01190, 2014 WL 5585334 (D.D.C. Oct. 27, 2014).

Passing over the IRS's argument that the Program causes the Institute's members no harm because it is voluntary, the district court agreed with the IRS that "each of [the Institute's] assertions of standing is fatally flawed in its own right." *Id.* at *4. The Institute appeals. Our review is de novo. *Mendoza v. Perez*, 754 F.3d 1002, 1010 (D.C. Cir. 2014) (reviewing a dismissal for lack of standing de novo).

## II.

The "irreducible constitutional minimum of standing contains three elements": (1) plaintiffs must have suffered an injury in fact that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical"; (2) the injury must be "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court"; and (3) "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992) (internal quotation marks and alterations omitted). In order to demonstrate Article III standing to maintain its procedural challenge—i.e., that the IRS failed to engage in notice and comment rulemaking—the Institute need show only that the Program itself, rather than the procedures used to adopt it, causes a redressable harm. *See Mendoza*, 754 F.3d at 1010. "In evaluating plaintiffs' standing at the motion to dismiss stage we must assume that the plaintiffs state a valid legal claim and must accept the factual allegations in the complaint as true." *Id.* (internal quotation marks and alterations omitted).

Associations have representational standing if: "(1) at least one of their members has standing to sue in her or his own right, (2) the interests the association seeks to protect are germane to its purpose, and (3) neither the claim asserted nor the relief requested requires the participation of an individual

member in the lawsuit." *American Library Ass'n v. FCC*, 401 F.3d 489, 492 (D.C. Cir. 2005). The IRS challenges only the first of these three requirements.

We begin and end with the Institute's claim of competitor standing. As explained in *Sherley v. Sebelius*, although we have employed "various formulations" for determining competitor standing, "the basic requirement common to all our cases is that the complainant show an actual or imminent increase in competition, which increase we recognize will almost certainly cause an injury in fact." 610 F.3d 69, 73 (D.C. Cir. 2010). In *Sherley*, we held that adult stem cell researchers had competitor standing to challenge Department of Health and Human Services guidelines that increased the range of embryonic stem cell research eligible to compete with their research for government grants. *Id.* at 72–74. In *Shays v. Federal Election Commission*, we held that two congressmen seeking reelection had competitor standing to challenge Commission regulations that they alleged allowed statutorily forbidden campaign practices. 414 F.3d 76 (D.C. Cir. 2005). Although the challenged regulations applied to the plaintiff congressmen as well as to their competitors, we held that "when regulations illegally structure a competitive environment—whether an agency proceeding, a market, or a reelection race—parties defending concrete interests . . . in that environment suffer legal harm under Article III." *Id.* at 87.

Here, the Institute's members, like the researchers in *Sherley* and the congressmen in *Shays*, will face intensified competition as a result of the challenged government action. Specifically, participating unenrolled preparers will gain a credential and a listing in the government directory. The Institute alleges—and we must accept as true for purposes of assessing its standing—that this will "dilute[] the value of a

CPA's credential in the market for tax-return-preparer services" and permit unenrolled preparers to more effectively compete with and take business away from presumably higher-priced CPAs. Appellant's Reply Br. 12.

After the completion of briefing in this case, this Court issued its opinion in *State National Bank of Big Spring v. Lew*, in which we denied a bank's claim that it had competitor standing to challenge the government's designation of a competitor as "too big to fail." 795 F.3d 48 (D.C. Cir. 2015). Although this designation subjected the competitor to additional regulation, the plaintiff alleged it would also result in a reputational benefit that would allow its competitor to borrow money more cheaply. *Id.* at 55. Rejecting this argument, we held that "the link between (i) the enhanced regulation of [the competitor], (ii) any alleged reputational benefit to [the competitor], and (iii) any harm to [the plaintiff] is simply too attenuated and speculative to show the causation necessary to support standing." *Id.*

In our view, the links we found unduly speculative in *State National Bank* are far tighter here. To begin with, the link between the government-backed credentials offered to unenrolled preparers and the reputational benefit they will enjoy is hardly speculative. Indeed, the reputational benefit is the very point of the IRS Program. As Commissioner Koskinen explained, the Program allows participants "to stand out from the competition by giving them a recognizable record of completion that they can show to their clients." Compl. ¶ 7 (internal quotation marks omitted). Moreover, unlike *State National Bank*'s mandatory "too big to fail" designation, which was not intended to be laudatory, the IRS Program at issue here is both voluntary and clearly intended to offer competitive benefits to those unenrolled preparers who participate in the Program. "Basic economic logic"

suggests that unenrolled preparers will choose to participate only if they believe the resulting reputational benefit will produce a substantial enough competitive advantage to outweigh their compliance costs. *Cf. United Transportation Union v. ICC*, 891 F.2d 908, 912 n.7 (D.C. Cir. 1989) (noting that allegations of competitive harm founded on "basic economic logic" can establish standing). And although the Institute has offered no evidence that the competitive harm has yet occurred, our precedent imposes no such requirement. "Because increased competition almost surely injures a seller in one form or another, he need not wait until allegedly illegal transactions hurt him competitively before challenging the . . . governmental decision that increases competition." *Sherley*, 610 F.3d at 72 (internal quotation marks and alterations omitted).

Seeking to escape this logic, the IRS argues that the Program will help unenrolled preparers compete only with other unaffiliated unenrolled preparers who decline to participate, rather than with the CPAs and CPA firms that comprise the Institute's membership. The Institute responds with two arguments: (1) that consumers will be confused about the meaning of the Record of Completion, believing either that it conveys IRS endorsement of the preparer or that it represents a superior credential to a CPA license; and (2) that even if the Program causes no confusion, it still causes competitive harm by "dilut[ing] the value of a CPA's credential in the market for tax-return-preparer services" and by making it more difficult for unenrolled preparers employed by the Institute's members to secure business. Appellant's Reply Br. 12.

Despite the fervor with which the parties dispute the confusion issue, we have no need to reach it because we agree with the Institute's second argument—that the Program harms

its members competitively even if it causes no confusion. The Institute alleges that unenrolled preparers are part of the same tax return preparation market as its members. Compl. ¶¶ 18–21. Indeed, the IRS itself reports that sixty percent of tax return preparers are unenrolled preparers. Appellees' Br. 4. We see nothing at all speculative or attenuated about the Institute's contention that "[u]nenrolled preparers with government-backed credentials will be better able to compete against other credentialed preparers, and especially against uncredentialed employees of [Institute] members." Appellant's Reply Br. 12. Nor do we see anything speculative or attenuated about the allegation that CPAs and their firms are more likely to lose business to an unenrolled preparer with a Record of Completion and a listing in the government directory than to an unenrolled preparer with no credentials at all.

The IRS argues that Institute members will face no increased competition from unenrolled preparers because both the Program itself and Circular 230 restrict how preparers can use their Records of Completion to advertise or solicit business. Appellees' Br. 32–34 & n.4. In support, the agency emphasizes that the Program makes clear that preparers "may not use the term 'certified,' 'enrolled,' or 'licensed' to describe [a Record of Completion] or in any way imply an employer/employee relationship with the IRS or make representations that the IRS has endorsed the tax return preparer." Annual Filing Season Program § 4.07. And Circular 230, the IRS points out, prohibits statements that are "false, fraudulent, or coercive" or "misleading or deceptive." 31 C.F.R. § 10.30(a)(1).

Without violating any of these restrictions, however, participating preparers remain free to tell potential clients that they have a Record of Completion demonstrating that they

satisfied the Program's educational requirements and passed the test. Indeed, that is the very purpose of the Program. Moreover, participating preparers' names will appear in the Directory of Federal Tax Return Preparers alongside the names of CPAs and other credentialed preparers. As the Institute helpfully sums up, "because the Rule distorts the competitive marketplace and dilutes [Institute] members' credentials by introducing a government-backed credential and government-sponsored public listing, it harms those members regardless of whether it also confuses consumers." Appellant's Reply Br. 13. Given that the Institute has adequately alleged that the Program "illegally structure[s] a competitive environment" in which its members "defend[] concrete interests," *Shays*, 414 F.3d at 87, the Institute has competitor standing.

This, however, does not end our task because the IRS also claims that the Institute's "'grievance'" does not "'arguably fall within the zone of interests protected or regulated by the statutory provision'" it invokes. Appellees' Br. 36 (quoting *Mendoza*, 754 F.3d at 1016); *see also id.* at 35–40. But the IRS never presented this argument to the district court, a prerequisite to our consideration of a non-jurisdictional issue absent "exceptional circumstances"—and there are certainly no such circumstances here. *Earle v. District of Columbia*, 707 F.3d 299, 308 (D.C. Cir. 2012). The IRS insists its zone of interests argument is jurisdictional, a surprising argument given that in a case the IRS itself cites, the Supreme Court squarely ruled to the contrary. *Lexmark International, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1387 n.4 (2014); *see Crossroads Grassroots Policy Strategies v. FEC*, 788 F.3d 312, 319 (D.C. Cir. 2015) (recognizing that *Lexmark* made clear that the zone of interests test is not jurisdictional). And although the IRS is correct that in *Mendoza v. Perez*, we addressed a zone of

interests argument after finding Article III standing, 754 F.3d at 1016, in that case the argument had been presented to the district court, *see Mendoza v. Solis*, 924 F. Supp. 2d 307, 321 (D.D.C. 2013).

## III.

For the foregoing reasons, we reverse.

*So ordered.*